IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

LAURIN NICHOLS and CARLATTA          )
NICHOLS, as Co-Personal              )
Representatives of the Estate of     )
Jason Nichols, Deceased,             )
                                     )
                Plaintiffs,          )
                                     )
v.                                   )          No. CIV-03-804-L
                                     )
OFFICER ALAN DAVISON and             )
OFFICER KEVIN SMITH,                 )
individually, jointly and severally, )
                                     )
                Defendants.[1]       )

# **O R D E R**

Plaintiffs, Laurin Nichols and Carlatta Nichols, are the personal representatives of the estate of their son, Jason Nichols.  Jason died on June 15 2002, after an altercation with his uncle and cousin and two Oklahoma City Police Officers, Alan Davison and Kevin Smith.  On June 11, 2003, plaintiffs filed this action for damages claiming that the officers violated Jason's Fourth Amendment right to be free from the use of excessive force.[2]  In addition, plaintiffs alleged defendants

---

[1]The Complaint and Amended Complaint also named as defendants the City of Oklahoma City and two officers under the fictitious names of Officer Doe and Officer Roe.  Plaintiffs' claims against the City were dismissed with prejudice on June 3, 2004, pursuant to the parties' stipulation. In the Joint Final Pretrial Report, the parties stipulated that Officers Doe and Roe should be deleted from the caption of the case.  Joint Final Pretrial Report at ¶ 3(2).

[2]In both the Complaint and the Amended Complaint, plaintiffs claimed defendants violated Jason's right to be free from unreasonable seizure.  Neither the Joint Final Pretrial Report nor the parties' summary judgment briefs address this claim.  The court therefore finds that plaintiffs have abandoned this claim.

violated Jason's Fourteenth Amendment rights by delaying or denying him medical treatment after his arrest.  In addition to the federal claims, plaintiffs alleged a state law survival action, as well as claims of gross negligence and wrongful death.

This matter is before the court on the officers' motion for summary judgment. Summary judgment is appropriate if the pleadings, affidavits, and depositions "show that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Any doubt as to the existence of a genuine issue of material fact must be resolved against the party seeking summary judgment.  In addition, the inferences drawn from the facts presented must be construed in the light most favorable to the nonmoving party. Board of Education v. Pico, 457 U.S. 853, 863 (1982).  Nonetheless, a party opposing a motion for summary judgment may not simply allege that there are disputed issues of fact; rather, the party "must set forth *specific* facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e) (emphasis added). *See also*, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).  "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50 (citations omitted).  In addition, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of

2

an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

The undisputed facts, taken in the light most favorable to plaintiffs, establish that on the evening of June 14, 2002, Jason was visiting the home of his uncle, Kevin O. Nichols ("Kevin"), and his cousin, Kevin T. Nichols ("KT").[3]  At some point in the early morning hours of June 15, 2002, a fight broke out between Jason and Kevin.   KT heard the altercation and went out to the garage to investigate. Deposition of Kevin Terrill Nichols at 32 (attached as Exhibit H to Plaintiffs' Response to and Brief in Support of Response to Defendants' Motion for Summary Judgment [hereinafter cited as "Plaintiffs' Response"]).   Kevin, who had been punched in the mouth, was bleeding and Jason was on top of him. Id. at 33-34.  KT tried to push and pull Jason off his father, but was unsuccessful. Id. at 35.  At some point, however, Kevin was able to extricate himself and went into the house.  Id. at 35-36.  KT blocked Jason from following his father into the house; this led to a fight between the two of them.  Id. at 37.  Kevin then came to KT's aid, and Jason and Kevin began fighting again.  Id. at 38.  When Jason and Kevin were on the ground, KT again tried to help his father by pulling at Jason.  When that was unsuccessful, KT hit Jason with a wooden handle which broke immediately on his back.  Id. at 38-

---

[3]The court does not normally refer to participants by their first names.  However, given that Jason Nichols, Kevin O. Nichols, and Kevin T. Nichols all have the same last name, the court uses their first names for the sake of clarity.

39.   KT, who was standing behind Jason, then hit him with a crutch, which also broke on impact.  Id. at 39-40.

At some point,[4] Kevin was able to call 911 and request police assistance. Smith received the call at 3:05 a.m. and reached the scene a few minutes later.[5] When Smith arrived at the scene, Jason and Kevin were locked together.  Smith yelled at the men to stop fighting, but they did not do so.  Davison, who had arrived shortly after Smith,  sprayed the three men with pepper spray.  Deposition of Alan Brett Davison at 34-35; Deposition of Kevin Terrill Nichols at 14; Deposition of Kevin Olson Nichols at 15-16.  After being sprayed, neither KT nor Kevin interfered with the officers' attempt to subdue Jason and neither could see clearly.  Deposition of Kevin Terrill Nichols at 15, 44, 57 ; Deposition of Kevin Olson Nichols at 45, 47-49.

The officers continued to attempt to subdue Jason by spraying him a second time.  Jason continued to struggle with the officers and kicked at them.  Deposition of Kevin Terrill Nichols at 45.  The officers[6] then hit Jason with their batons as he was lying on his back in a corner struggling to get up.  Id.; Deposition of Kevin Wayne Smith at 43-44; Deposition of Alan Brett Davison at 39.  Davison then used

---

[4]The record is not clear as to when Kevin made this call, but it appears it was when he went into the house before KT and Jason started fighting.  See Deposition of Kevin O. Nichols at 61 (attached to Plaintiffs' Response as Exhibit I).

[5]Exhibit 4A to Brief in Support of the Motion for Summary Judgment of Defendant Officers Alan Davison and Kevin Smith at 1 [hereinafter cited as "Defendants' Brief"].

[6]Smith and Davison both testified that only Smith used his baton that morning.  See Deposition of Kevin Wayne Smith at 44; Deposition of Alan Brett Davison at 11.  Kevin and KT, however, testified that both officers used their batons.  Deposition of Kevin Terrill Nichols at 45; Deposition of Kevin Olson Nichols at 16.  This factual dispute, however, is not material.

his taser gun on Jason.  Deposition of  Kevin Wayne Smith at 38-59; Deposition of

Alan Brett Davison at 39.   After five or six strikes with the taser, the officers were

able to grab Jason and drag him from the garage.  Deposition of Alan Brett Davison

at 46.  Jason was then placed in four-point restraints.  Deposition of Kevin Wayne

Smith at 65.

Although emergency personnel were called to the scene, Jason was

transported to Presbyterian Hospital by Smith.  Deposition of Kevin Wayne Smith at

72-73.  Jason arrived at the hospital at 3:40 a.m.  Exhibit 8 to Defendants' Brief at

2.  When he arrived at the hospital, Jason was unresponsive, though he had normal

blood pressure, a weak pulse, and was breathing.  Id.; Exhibit 7 to Defendants' Brief

at 1.   Thirteen minutes after Jason arrived at the hospital, medical personnel

discovered that he was "apneic with no respirations and lost his pulse."  Exhibit 7 to

Defendants' Brief at 3.   Although medical personnel performed cardiopulmonary

resuscitation, Jason did not respond and was pronounced dead at 4:23 a.m.  Id. at

3-4; Exhibit A to Plaintiffs' Response.  The cause of death was head trauma caused

by "[t]hree lacerations involving the parietal-occipital scalp with associated

hematoma and calvarial fissure/fracture".  Exhibit 8 to Defendants' Brief at 3-4.

Plaintiffs contend that defendants caused the head trauma by hitting Jason with their

batons.

Plaintiffs argue that defendants violated Jason's Fourth Amendment rights by

using a taser gun on him, placing him in hobble restraints, and hitting him in the

head with their batons.  Fourth amendment standards of objective reasonableness govern the analysis of plaintiffs' excessive force claim.  "The reasonableness of an officer's conduct must be assessed 'from the perspective of a reasonable officer on the scene,' recognizing the fact that the officer may be 'forced to make split-second judgments' under stressful and dangerous conditions."  Medina v. Cram, 252 F.3d 1124, 1131 (10th Cir. 2001) (*quoting* Graham v. Connor, 490 U.S. 386, 396-97 (1989)).  In assessing the reasonableness of force used by an arresting officer, the court considers the severity of the crime, the threat posed to the safety of the officer and others on the scene, and whether the person was resisting arrest.  *See* Wilson v. Meeks, 52 F.3d 1547, 1553 (10th Cir. 1995).  In making this assessment, the court views the totality of the circumstances.  Medina, 252 F.3d at 1132.

Viewing the facts in the light most favorable to plaintiff, the court finds the second and third factors weigh in favor of finding that no constitutional violation occurred.  The undisputed facts establish that defendants encountered a volatile and violent situation when they arrived at the Nichols' residence.  They were confronted with three fighting men with no clear indication of who the aggressor was.  Although Kevin and KT complied with the officers' directions after the use of pepper spray, Jason did not respond to oral commands to cease fighting, nor did he comply with the officers' demands after he was doused a second time with pepper spray.  Indeed, Jason kept struggling with the officers and began kicking at Smith.

6

In light of these circumstances, the use of the taser gun and batons were not objectively unreasonable.  Fourth Amendment jurisprudence "recognizes the right of the police, in making an arrest or a stop, 'to use some degree of physical coercion or threat thereof to effect it.'"  Hinton v. City of Elwood, 997 F.2d 774, 781 (10th Cir. 1993) (quoting Graham, 490 U.S. at 397).   In this case, defendants progressively increased the level of force used to subdue Jason, terminating with the use of taser strikes.  During this entire time, Jason was actively resisting the officers' attempts to handcuff him.  The use of the taser gun does not constitute excessive force under these circumstances.  Hinton, 997 F.2d at 781.   Likewise the use of four-point restraints to secure Jason once he was subdued does not constitute excessive force given Jason's violent behavior and continuing resistence.  Although plaintiffs' expert, Werner U. Spitz, M.D., refers to the method of restraint as hogtying, it is evident from plaintiffs' photograph of Jason that the restraint used did not meet the Tenth Circuit's definition of hogtying.[7]  See Exhibit  G to Plaintiffs' Response at 9.

With respect to the baton strikes, there is no evidence that the officers hit Jason in the back of the head.  All of the participants testified that Jason was lying on his back when the officers were striking him with the baton.[8]  The back of Jason's

---

[7]In Cruz v. City of Laramie, 239 F.3d 1183, 1188 (10th Cir. 2001), the Court defined the hogtie restraint as "binding of the ankles to the wrists, behind the back, with 12 inches or less of separation."

[8]Although Kevin testified "I know they hit him in the head several times", he did not explain how he knew the strikes were to Jason's head.  Deposition of Kevin Olson Nichols at 17 (emphasis added).  Later in his testimony, Kevin admitted,

head was thus not exposed to their baton strikes.  This is consistent with the only

eye-witness testimony[9] – that is from Smith and Davison, as both Kevin and KT

admitted that they could not see where Jason was being struck.  Deposition of Kevin

Olson Nichols at 45; Deposition of Kevin Terrill Nichols at 15, 45, 47.  Moreover,

when asked "[s]pecifically which injuries on the body of Jason Nichols were

consistent with the use of police weapons, and which weapons would those have

been?" the Medical Examiner responded:

> There were abrasions about the wrists that would be
> consistent with the usage of handcuffs.  There was a
> patterned contusion to the outer left thigh which would be
> consistent with a baton strike.  There were taser probe
> implantation sites noted at the right upper arm and left
> upper abdomen which would be consistent with the
> deployment of a taser weapon.

Exhibit 9 to Defendants' Brief at 3.  Significantly, the Medical Examiner did not

include the head wounds in this litany.  Nor can plaintiffs rely on their experts'

conclusory affidavits to create a genuine issue of fact with respect to this issue.  *See*

Medina, 252 F.3d at 1133.  The experts' affidavits do no more than state the

conclusion that the head wounds were caused by the officers' baton strikes.  Dr.

---

> All I know is they hit him a lot and they were hitting him to get him off
> of my son.  Now, where, I have no clue.  *I couldn't see clearly.*  All I
> know is they hit him. . . .  They hit him and hit him and hit him and
> they were talking to him as they hit him. . . .   Roll over, he wouldn't
> roll over.

Deposition of Kevin Olson Nichols at 45 (emphasis added).

[9]Deposition of Kevin Wayne Smith at 48-50; Deposition of Alex Brett Davison at 39.

Spitz merely states "[i]t is evident . . . that Jason Nichols sustained severe concussive brain injuries as a result of at least 3 violent baton strikes."  Exhibit D to Plaintiffs' Response at ¶6.  Likewise, Dr. Bruce J. Ammerman simply opines that "[m]ore likely than not [the head wounds were] related to baton blows or similar objects.  In my opinion, the skull fractures, cerebral edema and closed head injury was (sic) not caused by a wooden mop handle or crutch."  Exhibit F to Plaintiffs' Response at ¶ 7.  The experts, however, offer no facts in support of these conclusions.  Because there is no evidence that the officers struck Jason in the back of the head with their batons, the court finds no constitutional violation occurred.

Plaintiffs' Fourteenth Amendment claim is premised on the officers' preventing or delaying emergency medical personnel from treating Jason.  To establish a Fourteenth Amendment violation, plaintiffs must demonstrate that the officers were deliberately indifferent to Jason's serious medical needs.  *See* Lopez v. LeMaster, 172 F.3d 756, 764 (10th Cir. 1999).  While delaying medical treatment can constitute a constitutional violation, plaintiffs present no evidence that defendants delayed or prevented emergency medical technicians at the scene from examining Jason.  In fact, Smith testified that "after we get him under control . . . then EMSA showed up and they came over and looked at [Jason]."  Deposition of Kevin Wayne Smith at 66.  Defendants' duty under the Fourteenth Amendment was to summon medical aid and to transport Jason to the hospital.  *See* Wilson, 52 F.3d at 1555-56.  The entire sequence of events – from the time dispatch received the 911 call to the time Jason

9

arrived at the hospital – took 35 minutes.  The record shows that defendants fulfilled their obligation to provide medical care to Jason in a timely manner.  As tragic as the death of this young man was, it was not the result of a constitutional violation. Defendants, therefore, cannot be held liable pursuant to 42 U.S.C. § 1983.

Based on the above analysis, the court concludes defendants are entitled to summary judgment on plaintiffs' § 1983 claim.  As plaintiffs' federal claim has been disposed of, the court declines to exercise supplemental jurisdiction over plaintiffs' state law claims.  Defendants' Motion for Summary Judgment (Doc. No. 72) is therefore GRANTED in part and DENIED in part.  Defendants are entitled to judgment in their favor on Count I of the Amended Complaint; Counts II, III, and IV of the Amended Complaint are dismissed **without prejudice** pursuant to 28 U.S.C. § 1367(c)(3).  Judgment will issue accordingly.

It is so ordered this 26th day of July, 2005.

_Tim Leonard_

TIM LEONARD
United States District Judge